ZINTER, Justice
(concurring in part and concurring in result in part).
[¶ 36.] I join the opinion of the Court on all issues except assumption of the risk. On that issue, I concur in result. In my view, there was insufficient evidence for an assumption of the risk instruction. Nevertheless, because of the general verdict form, Wangsness has not established reversible error. See Majority Opinion note 2.
[¶ 37.] A circuit court may only give those instructions that are supported by evidence. Miller v. Baken Park, Inc., 84 S.D. 624, 631, 175 N.W.2d 605, 609 (1970); Orrison v. City of Rapid City, 76 S.D. 145, 156, 74 N.W.2d 489, 495 (1956). There *146 fore, to get an instruction on assumption of the risk, an affirmative defense, Builders Cashway was required to submit evidence that Wangsness had knowledge of the “specific defect and risk posed, rather than simple generalized knowledge that he has entered a zone of danger.” See Supra ¶ 13 (citing Novak v. Navistar Int'l Transp. Corp., 46 F.3d 844, 848-49 (8th Cir.1995)). Although Builders Cashway submitted evidence that Wangsness had general knowledge regarding operation of the bi-fold door, it submitted no evidence that prior to the accident Wangsness knew of, let alone appreciated, the risk associated with the alleged specific defect and risk posed: the unshielded rotating shaft and cable mechanism, a component of the door.
[¶ 38.] Wangsness, who was fifteen-years-old at the time, was the only witness to the accident. Wangsness, however, had no recollection of the events leading up to and including the accident. Further, although he was generally aware that it was a good practice to keep the area under the door clear during operations, Wangsness had never heard of anyone in the family having trouble with the door, and he had not read the caution stickers on the door. Additionally, the record reflects that Wangsness never received any specific instruction on the use of the door. Thus, he testified that despite “all the years [he was] around the shop” observing the door, he was unaware that the “mechanism,” the drum and cable system at issue, was part of the door. He believed the door operated on “the same principle as a regular garage door.” This evidence was not contradicted.
[¶ 39.] Even the circumstantial evidence suggesting how the accident may have occurred did not suggest Wangsness had knowledge of the specific defect and risk posed by the drum and cable system. Wangsness testified that he would have operated the door by use of start and stop “buttons” that were located away from the door. Because the door was not usually opened all the way, Wangsness indicated that the operator needed to be “at the control” to push the stop button when operating the door. On the day of the accident, Wangsness indicated that he would have had no reason to leave that remote location at the controls to operate the door. Consistent with this method of operation, in his first statement after the accident — in an attempt to speculate with an expert how the accident may have happened — Wangsness indicated that he may have “tripped,” and in reaching out to break his fall, his fingers got caught in the drum mechanism as he was falling into the door. The only other version of the accident came from Wangsness’s answer to interrogatories in which he indicated that he had activated the control to raise the door, and was walking along the door when the pinch point of the door caught his hand. None of the possible explanations suggested that Wangsness knew of the drum and cable mechanism and the risk it posed.
[¶ 40.] There was certainly no evidence to support the majority’s claim that ‘Wangsness understood that failing to keep his hands away from the rotating shaft and cable mechanism on the bi-fold door could result in serious injury.” See Supra ¶ 15. Wangsness’s testimony on this point was only a reference to the danger of putting his hands into “moving machinery” in general. With respect to this door, however, he testified he did not know there was a risk of injury from the rotating shaft and cable mechanism. He explained, “you really don’t see it” when you open the door. He further indicated that his understanding of the specific risk came to light only after the accident. He testified that “now” having seen the mechanism after the accident, he understood *147 that he could be hurt by putting his hands in the mechanism. Wangsness’s specific testimony on this issue does not support the majority’s claim:
Q: From your experience around the farm, you know you shouldn’t put your hands into moving machinery, correct?
A: Correct.
Q: And you seen [sic] the video [after the accident], correct?
A: Yes.
Q: And you seen [sic] the mechanism since the accident, correct?
A: Correct.
Q: You agree that it would be important to keep your hands away from the cable when it’s moving, correct?
A: Correct.
[[Image here]]
Q: You or any person would know, based upon how that operates, that if you put your hand in it or near it, there’s a risk of your hand being injured, correct?
A: Well, since you don’t really see it, no.
[[Image here]]
Q: Having seen that mechanism now, you would understand that if you put your hands in it, you could hurt your hand in it, correct?
A: Correct.
(Emphasis added.)
[¶ 41.] The majority is also incorrect in claiming: “Likewise, Wangsness’s experts testified that a reasonable person could appreciate the visible danger of the rotating shaft and cable mechanism.” See Supra ¶ 15. On the contrary, the record reflects that Wangsness’s expert testified a person would not appreciate this risk. Expert Jim Suhr testified that a reasonable person could appreciate the risk if they studied the door and the video, but not if the accident happened in the manner reflected by the evidence. Suhr testified:
Q: You don’t think a reasonable person would know if they put that hand in their cable and drum that they could hurt their hand?
A: If you study that door and look at it and see what’s in that video, focusing on that cable and drum, yes, you can clearly see that. But now, if you are the person out in that shop that hits the door to raise it, and then as it’s raising you go by it, and you inadvertently catch your left hand in it or if you trip and get your left hand in it, as you’re going to your car, now, you don’t realize the potential that that mechanism has. The risk.
[¶ 42.] The majority finally misapplies the rule that in order for a plaintiff to have assumed the risk, “it [must be] the type of risk that no adult of average intelligence can deny.” See Supra ¶ 13 (citing Duda v. Phatty McGees Inc., 2008 SD 115, ¶ 13, 758 N.W.2d 754, 758) (emphasis added). Although the majority is correct that the circuit court provided a “standard of care” instruction applicable to juveniles, the instruction related to contributory negligence rather than assumption of the risk. In distinguishing the two defenses, this Court has specifically pointed out that such standards of conduct relate to questions of negligence, but the question in assumption of the risk is “knowledge of the danger and intelligent acquiescence in it.” Bartlett v. Gregg, 77 S.D. 406, 413, 92 N.W.2d 654, 658 (1958) (emphasis added). Yet in this case, the circuit court’s instruction on a juvenile standard of conduct did not advise the jury that a fifteen-year-old is not bound by an adult’s mental capacity and a juvenile must have fully recognized and intelligently acquiesced in assuming *148 the specific risk. As we noted in Dodson, a case involving diminished mental capacity, an assumption of the risk instruction should be given only if the trial court determines a plaintiff with less than full mental capacity “possessed full comprehension and appreciation of the danger of injury.” Dodson v. S.D. Dep’t of Human Serv., 2005 SD 91, ¶ 18, 703 N.W.2d 353, 360.[4]
[¶ 43.] Ultimately, this case is similar to Thomas v. St. Mary’s Roman Catholic Church, 283 N.W.2d 254 (S.D.1979). There, we observed that “while [the plaintiff] may have assumed certain risks of danger inherent in playing the game of basketball ..., he did not assume the risk that the glass panel located in such close proximity to the basket would break upon impact.” Id. at 260. We concluded, “[s]ince knowledge and appreciation of a particular risk are essential to the defense of assumption of risk, a plaintiff must only be held to assume the risk he appreciates, not the risk which he does not.” Id. (citing Restatement (Second) of Torts § 496c cmt. i (1965)). The same is true with Wangsness. He may have appreciated the nature and risk of opening a large bi-fold door, but there was no evidence he had an adult’s appreciation of the specific defect and risk posed by the unshielded drum and cable mechanism. Therefore, the circuit court erred in giving the instruction.
[¶ 44.] MEIERHENRY, Justice, joins this special writing.

. All of the majority’s cited authorities confirm that the circuit court's juvenile standard of care instruction involved cases concerning issues other than assumption of risk. See Supra n. 1. Those cases involved issues of the existence of a duty or defining the standard of care for negligence, contributory negligence, and willful and wanton conduct. None of the majority's authorities suggest a juvenile standard of care instruction satisfied the court’s duty to instruct the jury to assess whether Wangsness possessed the full mental comprehension and appreciation of the specific defect and risk that is commensurate with that possessed by an adult.